**AMERICAN GENERAL LEASING, INC. and Infodyne Systems Corp.**

v.

**The UNITED STATES.**

**No. 255–77.**

United States Court of Claims.

Nov. 15, 1978.

James J. McGillan, Washington, D. C., atty. of record, for plaintiff; Michael P. Goldenberg, Michael R. Gordon, Washington, D. C., of counsel.

Anthony Thompson, Washington, D. C., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and KUNZIG, and BENNETT, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

KUNZIG, Judge:

In this contracts disputes case, plaintiffs American General Leasing, Inc. (AGL) and Infodyne Systems Corp. (Infodyne) together seek $526,095 in damages in the form of lost net profits for the breach of an alleged express oral contract. As an alternative, Infodyne alone seeks $65,400 in damages (bid preparation costs) for the alleged arbitrary and capricious cancellation of the solicitation in question. In response, the Government has moved for summary judgment as to both claims and, in addition, asked for leave to amend its original answer.

We agree with the Government, viewing the facts in the light most favorable to plaintiffs, that no binding oral contract between the parties was entered into and thus plaintiffs have failed to state a claim upon which relief can be granted. In re the

alternative claim for bid preparation costs, we hold the cancellation of the solicitation was proper and in accord with applicable procurement regulations. Therefore, no claim for damages will lie against the Government.

At the outset, we examine defendant's motion, pursuant to Rule 38(h) of this court, to amend its original answer to include as an affirmative defense that 31 U.S.C. § 200 is a statutory bar to plaintiffs' claims.[1] However, because of our disposition of the present case, *infra*, we find it unnecessary to reach the statutory bar problem.

Turning to the basic issue in question, the alleged breach of an express oral contract, we note the following facts. On September 4, 1975, the Department of Commerce issued a Request for Proposals (RFP) for the rental of a magnetic tape subsystem to be used by the U.S. Bureau of Census. On September 23, 1975, plaintiffs submitted a formal proposal in response to the Government's solicitation. Infodyne, as the prime contractor, submitted a comprehensive proposal which envisioned an offer to supply computer hardware through its subcontractor, Systems Engineering Laboratory (SEL) and a further offer by Infodyne to supply computer software services. Under the proposal, AGL would finance the purchase of the system from Infodyne and AGL in turn would enter into a Master Lease Agreement with the General Services Administration (GSA) which would make payments to AGL from its Automatic Data Processing (ADP) Revolving Fund established pursuant to 40 U.S.C. § 759. GSA would then arrange for the Census Bureau to use the system.

On October 1, 1975, Infodyne's proposal was rated "technically superior" to other offers received in response to the RFP, by an Evaluation Committee of the Bureau of Census. Subsequently, on October 14, 1975, personnel from Commerce, the Census Bu-reau and Infodyne met to negotiation certain changes to Infodyne's proposal.

On November 21, 1975, the Contracting Officer (CO), officials from Infodyne, and various other Commerce officials attended a meeting in an attempt to finalize negotiations on the contract. Various changes were negotiated at this meeting which were confirmed by letter dated November 22, 1975, from Infodyne to the Department of Commerce. At the conclusion of the November 21 meeting the CO indicated that he would issue the following Monday, November 24, 1975, a letter of intent evidencing the Department's commitment to the agreement.

*The CO failed to issue the letter of intent the following Monday.* On December 1, 1975, Infodyne lodged a formal protest with the Comptroller General's Office. On December 9, 1975, the CO cancelled the solicitation stating as the reason therefore a "revision in the Government's requirements."

On July 12, 1976 the Comptroller General ruled that no binding contract came into existence on November 21, 1975 and that there was no abuse of administrative discretion in cancelling the procurement solicitation. Plaintiffs then filed a timely petition in this court on May 11, 1977.

Plaintiffs contend that at the November 21, 1975 meeting the parties had entered into a binding express oral contract that was enforceable against the Government. Alternatively, Infodyne contends that certain officials acted arbitrarily and capriciously in causing the cancellation of the proposed solicitation.

Defendant counters essentially using the arguments of the Comptroller General, *supra*, that no binding contract came into existence because the parties contemplated a formal written agreement that was never

---

1. 31 U.S.C. § 200 (1976) states in pertinent part:

". . . [N]o amount shall be recorded as an obligation of the Government of the United States unless it is supported by documentary evidence of—

(1) a binding agreement *in writing* between the parties thereto, including Government agencies, in a manner and form and for a purpose authorized by law . . ." (emphasis added).

executed. Additionally, the Government responds that the cancellation was proper and in compliance with applicable Government regulations. Moreover, the alternative bid cost claim sounds in tort, is improperly pleaded, and should be dismissed.

We hold for defendant.

Plaintiffs argue that a binding oral contract came into existence on November 21, 1975. They allege that all the essential terms and conditions of the contract had been concluded, except the obtaining of GSA approval of the Master Lease and the mechanics of executing the formal document. Plaintiffs maintain that the absence of GSA approval resulted directly from the Government's failure even to ask for GSA approval in violation of its constructive duty of cooperation implied in fact in this contract.

Defendant strenuously objects, urging that plaintiffs' position disregards the language of the applicable procurement regulations, the language of the Government's original solicitation and plaintiffs' own offer and letters of confirmation. All of these documents demonstrate that the parties expressly envisioned the final step in concluding a contractual relationship would be the execution of a formal written instrument.

The original solicitation, incorporated § 10(d) of Standard Form 33A (March 1969) which provides that "Acceptance of Offer" will be in writing:

> (d) A *written* award (or Acceptance of Offer) mailed (or otherwise furnished) to the successful offeror within the time for acceptance specified in the offer shall be deemed to result in a binding contract without further action by either party. (emphasis added)

In the present case, no written award was ever furnished to the plaintiffs.

Plaintiffs' response to the solicitation also is indicative that the parties contemplated a formal document in order to bind each other to a contractual relationship. The offer states in pertinent part:

> In order for the Government to commit to this offer, it is only necessary *that formal notification be made of general acceptance* of the technical and business proposals and that the General Services Administration *sign a long term Master Lease Agreement* with American General Leasing, Inc., which will finance the project. (emphasis added)

Again, no formal notification, *i. e.* a written award, was ever furnished to the plaintiffs, nor was the lease agreement entered into.

Further, plaintiffs allege that their letter of November 22, 1975 confirmed the claimed verbal agreement of November 21, 1975. However, defendant emphasizes, and we agree, that upon closer scrutiny the letter reveals that no binding contract between the parties came into existence on that date. The fourth paragraph of the November 22 letter states:

> It is understood that upon receipt by AGL and ISC (Infodyne) of a letter from Commerce by 12 P.M. November 24, 1975, stating its intention to sign a contract in accordance with the proposal, contingent upon availability of the revolving fund at GSA, that AGL will attempt to negotiate a 7-day extension of the proposed money rate through November 30, 1975.

Thus, the letter clearly indicates two prerequisites necessary in order to bind the parties contractually: (1) a written letter by Commerce, and (2) the obtaining of formal financing from GSA, neither of which occurred.

41 C.F.R. § 1–1.208 provides:

> "Contract" means establishment of a binding legal relation . . . . It includes all types of commitments which obligate the Government to an expenditure of funds and which except as otherwise authorized *are in writing.* In addition to a two signature document, it includes all transactions resulting from acceptance of offers by awards or notice of awards; agreements and job orders or task letters issued thereunder; letter contracts; letters of intent; and orders such as purchase orders, under which the contract becomes effective by written ac-

ceptance or performance . . . . (emphasis added).

 The Federal Procurement Regulations have the force of law. Moreover, parties contracting with the Government are charged with having knowledge of the law governing the formation of such contracts. *G. C. Casebolt Co. v. United States,* 421 F.2d 710, 190 Ct.Cl. 783 (1970) (Collins, J., concurring). Therefore, it is clear, in addition to other manifestations of the parties' intent, that applicable procurement regulations, in the present case, require Government contracts to be in writing in order to be binding upon the parties.

We hold, based upon the foregoing, the parties envisioned a formal writing as the only document which could establish a binding contractual relationship between them. *Ship Construction & Trading Co., Inc. v. United States,* 91 Ct.Cl. 419 (1940), *cert. denied,* 312 U.S. 699, 61 S.Ct. 737, 85 L.Ed. 1133 (1941). A written award pursuant to the solicitation was never furnished to the plaintiffs. Unless such award was issued, no contract existed. *Schlesinger v. United States,* 390 F.2d 702, 182 Ct.Cl. 571 (1968); *Ship Construction & Trading Co., supra.*

Nor was there any detrimental reliance by plaintiffs on the existence of a contract, or action by the parties in conformance with an alleged contract as in *Penn-Ohio Steel Corporation v. United States,* 354 F.2d 254, 173 Ct.Cl. 1064 (1965). Further, plaintiffs never received authorization in writing to proceed with the contract as in *North American Iron & Steel Co. v. United States,* 130 F.Supp. 723 (E.D.N.Y.1955). In short, here we have two parties who *never did anything* in actual performance of the supposed contract. The parties may have completed the negotiations that would have led to a contract, but they had not taken the final and essential step of actually executing an agreement.

 Further it appears that the securing of GSA's approval of the Master Lease Agreement was a contingency which both parties understood to be a condition to the formation of the contract. It is undisputed that GSA, in fact, had not acted in this respect. Regardless of whether GSA would or would not assent to the arrangement, it is elementary that where it is necessary for a third party to take action before contract formation, no contract exists until that action has occurred. *Colonial Metals Co. v. United States,* 494 F.2d 1355, 1359, 204 Ct.Cl. 320, 327 (1974), *citing Cutler-Hammer, Inc. v. United States,* 441 F.2d 1179, 1182–83, 194 Ct.Cl. 788, 794–95 (1971).

Plaintiffs argue that the "Government [Commerce Department] cannot set up as a defense to its breach the bad faith failure to fulfill the condition subsequent of seeking GSA approval." Defendant counters and we again agree that the obligation of securing the Master Lease was solely between GSA and AGL. We are unable to discern from either the solicitation, plaintiffs' offer or their November 22, 1975 letter, any obligation on the part of Commerce to secure the lease arrangements. Nor is there any indication that Commerce attempted to hinder any negotiations or arrangements between those parties. If plaintiffs' emphasis on a "bad faith failure" here is on a failure to fulfill a condition subsequent to the alleged contract, even viewing the facts in the light most favorable to the plaintiffs, we fail to see that Commerce had any such obligation. If, however, the emphasis is directed at a *bad faith* interference with plaintiffs' rights in that Commerce somehow "purposefully" failed to go to GSA, such a claim sounds in tort and falls outside the jurisdiction of this court. *See, Eastport Steamship Corp. v. United States,* 372 F.2d 1002, 178 Ct.Cl. 599 (1967).

Thus, we hold in the instant case there is no binding express oral contract between the parties enforceable against the Government.

 Infodyne maintains in its alternative count that certain officials of Commerce acted arbitrarily and capriciously in rejecting plaintiffs' bid for reasons wholly unrelated to the merits of their proposal. This argument is not well taken. It is settled law that no assurance exists that a

contractor will receive an award and that the Government retains, in its discretion, the right to reject all bids without liability, even after there have been extensive negotiations with a bidder. *Keco Industries, Inc. v. United States*, 492 F.2d 1200, 203 Ct.Cl. 566 (1974); *Robert Simmons & Associates v. United States*, 360 F.2d 962, 175 Ct.Cl. 510 (1966).[2] Moreover, it is clear that Infodyne has failed to allege facts from which could be inferred a "specific intent to injure the plaintiff." *Kalvar Corp., Inc. v. United States*, 543 F.2d 1298, 1302, 211 Ct.Cl. 192, 199 (1976). This burden is especially acute because such intent must be shown "with well-nigh irrefragable proof." *Knotts v. United States*, 121 F.Supp. 630, 631, 128 Ct.Cl. 489, 492 (1954). Additionally, if Infodyne is suggesting any impropriety on the part of specific officials, such a claim once again is mired into the field of torts and outside the jurisdiction of this court. *Eastport Steamship Corp., supra.*

Finally, Infodyne's submissions fail to controvert the Government's affidavits that the cancellation had a reasonable basis. Indeed, to the contrary, Infodyne's submissions are based in large part on speculation and lack the requisite personal knowledge required of such affidavits.[3] Thus, where the Government alleges a reasonable basis for cancelling the solicitation, *i. e.* a revision in specifications,[4] it is clear that plaintiffs must do more than assert what amounts to mere naked charges of arbitrary and capricious action in order to obtain a trial. *Keco Industries, supra*, 492 F.2d at 1208, 203 Ct.Cl. at 581, *citing Greenway v. United States*, 163 Ct.Cl. 72, 82 (1963).

We therefore find the cancellation of the solicitation to have been proper and in accord with applicable procurement regulations. Infodyne must fail in its effort to win bid preparation costs for the alleged arbitrary and capricious cancellation of the solicitation.

Accordingly, we hold, after careful consideration of all the parties' submissions, without oral argument, that defendant's motion to amend its original answer is denied since we find it unnecessary to reach the statutory bar problem. Defendant's motion for summary judgment is granted and plaintiffs' petition is dismissed.

**2.** Indeed, plaintiff has conceded that the Solicitation incorporated the "Solicitation Instructions and Conditions" of Standard Form 33A (March 1969) wherein the Government reserved the right to reject any and all offers. Pl.Pet. Exh. 6 at 1.

**3.** Ct.Cl. Rule 101(f) affirmatively requires opposing affidavits to be based on the personal knowledge of the affiant.

**4.** *See*, Federal Procurement Regulations (FPR) § 1–2.404–1 (1977) which reads in pertinent part:

(b) Invitations for bids may be cancelled after opening but prior to award, and all bids rejected, where such action is consisted with § 1–2.404–1(a) and the contracting officer determines in writing that cancellation is in the best interest of the government for reasons such as the following:

(1) Inadequate, ambiguous or otherwise deficient specifications were cited in the invitation to bid.